## GRIFFING et al. v. DUNN et al.

A sale of the good will of a firm business, together with an agreement not to again enter into such business, is an act tending to the termination of the firm business, and is within the powers which cannot be presumed that the partners intended to clothe individual members.

Under Rev. Civ. Code, §§ 1277, 1278, providing that one selling the good will of a business may agree with the buyer to refrain from carrying on a similar business within a specified territory and time, and section 1741, providing that a partner has no authority to dispose of the good will of the business, one claiming to have bought the good will of a firm business, together with an agreement not to again enter into such business, must show that the partners with whom he contracted, if less than all, either were authorized to enter into the contract, or that the other partners with full knowledge of the contract ratified the same.

Evidence **held** neither to show that a contract of the sale of the good will of a firm, together with an agreement of the partners not to enter into a similar business, was made by all the partners, nor that the partners making the contract had authority from a copartner, precluding the buyer from relying on the contract, in the absence of a ratification of the contract by the copartner.

Evidence **held** not to show that a partner ratified a contract of sale of the good will of the firm made by the copartner.

Ratification by a partner of the act of the copartner selling the good will of the firm business can only be accomplished by the partner accepting the benefits of the sale with full knowledge of all the circumstances.

(Opinion filed, April 6, 1909.)

Appeal from Circuit Court, Hamlin County. Hon. GEORGE H. MARQUIS, Judge.

Action by S. B. Griffing and another against E. S. Dunn and others. From a judgment for plaintiffs and an order denying a new trial, defendants appeal. Reversed.

*Wilbur S. Glass,* for appellants.

The good will of a business is the expectation of continued public patronage. Sec. 893 Civ .Code. Only the one who sells the good will of the business can agree to refrain from carrying on a competing business within a specified place. Sec. 1278, p. 761, C. C. Contracts of restraint are void unless made by the person selling the good will of a business; section 1277, p. 761 C. C.

*Hall, Lawrence & Roddle,* for respondents.

The liability of partners, as such, depends upon the principles of agency. The basis of the liability of the members of a firm is the fact that they are principals in any and every transaction, not that they are credited or held out as partners. Any act done by a partner within the actual scope of the agency conferred upon him is, of course, binding upon all the partners as a firm. 22 Enc. Law, 2d Ed. 135. A party who adopts and seeks to enforce a contract made in his behalf ratifies not only the contract, but the negotiation by which it was procured. Union Trust Co. v. Phillips, 7 S. D. 225. A party cannot claim the benefit of a contract made in his behalf by one assuming to act as agent, and at the same time repudiate the representations of the agent by which the contract was procured, although the agent, to the knowledge of the

other party to the contract, had an interest in its making, distinct and separate from that of the principal, in the absence of collusion or fraud between the contracting parties. Id. The acceptance of the benefits of an unauthorized act of an agent estops the principal from denying authority. Morris v. Ewing, 12 S. D. 218. Ratification is a question for the jury and is to be determined by a consideration of all the circumstances. Ellis v. Allen, 80 Ala. 515; Galway v. Nordlinger, 4 N. Y. Supp. 649; Towle v. Dunham, 84 Mich. 268; Monongahela Valley Bank v. Weston, 159 N. Y. 201; McElroy v. Melear, 7 Coldw. 140.

WHITING, J. This is an action brought by the respondents against the appellants to recover damages for an alleged breach of contract. Trial was had before jury, plaintiffs recovering verdict and judgment thereon, and the case is in this court upon appeal from such judgment and from an order denying a new trial. From the pleadings and evidence it appears, that the plaintiffs, being engaged in the harness business at Bryant, S. D., purchased from the defendants, a partnership, a remnant of a harness stock owned by defendants. Defendants were in the hardware business, and had for some time carried a stock of harness goods in connection with said business. The plaintiffs further claimed that as a part of the contract of purchase of such stock, and as a partial consideration for the money to be paid by said plaintiffs, the defendants sold to plaintiffs the good will of their harness business, and further contracted not to again engage in such business at Bryant so long as plaintiffs were engaged in such business at that place. Defendants deny that they ever sold such good will or contracted to not again engage in such business. It appears that within a year defendants again engaged in such business at Bryant, and plaintiffs ask damages for the breach of such alleged contract.

Several errors were claimed by appellants in their abstract, but the only assignment they rely upon on this appeal is the error which they claim the trial court made in not directing verdict for defendant at the close of all the evidence.

Appellants claim that there was no evidence to show that all the members of defendant firm entered into the contract for the

sale of the good will of such business if such a contract ever was made by any member of the firm; further, that there is no evidence to show that the member or members of appellant firm that made the sale of said remnant of harness stock had any authority from the rest of the firm to sell the good will of the business; and, lastly, that, providing it is shown that a sale of the good will of the business was attempted to be made by any member or members of appellants' firm, there is no evidence to show any ratification of any such sale of the good will by the remaining member or members of the firm. We think that the appellants are right in their contention. By section 1277 Rev. Civ. Code, it is provided: "Every contract by which one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by the next two sections, is to that extent void." Section 1278 of the same Code provides: "One who sells the good will of a business may agree with the buyer to refrain from carrying on a similar business within a specified county, city, or part thereof, so long as the buyer, or any person deriving title to the good will from him, carries on a like business therein." Section 1741 of the same Code provides: "A partner, as such, has not authority to do any of the following acts, unless his copartners have wholly abandoned the business to him, or are incapable of acting: * * *   (2) To dispose of the good will of the business." From reading the above sections we find, first, a general statute against contracts in restraint of trade; second, an exception to this general law; third, a law taking from a partner as such the power to bind his firm to a contract coming under the exception noted. The reason for these laws is obvious. Any ordinary contract in restraint of trade is against public policy. The exception is allowed for the benefit of the contracting parties, because it may be of great benefit to the parties to the contract, and ordinarily would not injure the public. But the sale of the good will of a partnership business is not an act tending to the continuance of the business, but to the terminating thereof, and comes among that class of powers which it cannot be presumed that partners intended to clothe the individual members of a partnership with. It is certainly incumbent upon one claiming to have purchased the good will of a partnership business,

and with it to have obtained an agreement coming under the exception to the general law in regard to contracts in restraint of trade, to show clearly that the parties with whom they contracted, if less than the whole firm, either were fully authorized to enter into the contract or else that the remainder of the firm, with full knowledge of all the covenants of the contract, ratified the same.

It appears that the appellant firm consisted of three members—Dunn, Van Schoiack, and Underwood—and what business, if any, that was transacted with the said firm, was with the said Van Schoiack and Dunn; there being absolutely no evidence to show that Underwood in any way took part in such contract, if any, or was in any way bound except by ratification of such contract, unless it can be shown that he was knowing to said contract at the time it was made or had authorized the same. There is no claim that any member of this firm had abandoned the business or was incapable of acting at the time the contract in question was entered into. In the case of Kelly et al. v. Pierce et al., 16 N. D. 234, 112 N. W. 995, 12 L. R. A. (N. S.) 180, it appears that it was the contention that a firm comprised of one McLaughlin and the plaintiff Kelly had entered into a contract whereby they agreed to discontinue the feed and livery business as a part of the contract wherein they had sold to the defendants a certain livery stock. It was the claim of Kelly that he never entered into any agreement to go out of the feed and livery business, and the court in discussing the case say: "Even if it be conceded that the plaintiff McLaughlin, on behalf of his firm, agreed to refrain from thereafter doing any feed and livery business, the contract would not be of any effect, as, under the express terms of section 5836, Rev. Codes 1905, one partner has no power to dispose of the good will of the business. Hence the contract would be void if it had been made, as it is not contended that the plaintiff Kelly ever agreed to retire from the feed business, and he has at all times maintained that he desired to continue in the feed business, and has at all times refused to consent to retire from that business and the record shows that the plaintiff McLaughlin refused to make such a contract unless agreed to by his copartner." The last part of the above has

no bearing upon the issues in this case, but the first part shows
that our sister state has strictly upheld the provisions of the stat-
ute common to the two states.   In the case of Doll v. Hennessy
Mercantile Co., 33 Mont. 80, 81 Pac. 625, we have a case coming
under another subdivision of our section 1741 above referred to,
which forbids one person in disposing of the whole of the partner-
ship property at once, and therefore what the court may say in
relation to such section would be relevant to the issues in this case.
It appears that the plaintiff and one Fleming as partners were en-
gaged in the retail ice business, the same being under the imme-
diate charge of Fleming, plaintiff being a traveling salesman, and
therefore away from the city where the business was conducted
considerable of the time.   This firm was the owner and possessed
of 1,600 tons of ice, and it is claimed that Fleming entered into a
conspiracy to sell and dispose of said ice to defraud the plaintiff
of his interest therein.   On the other hand it was claimed that the
sale which was made by Fleming was bona fide, and that the same
was approved of and fully ratified by plaintiff, that plaintiff re-
ceived part of the consideration paid for said ice, and that a large
part of said consideration was used in paying the debts of plain-
tiff and his partner as such partners.   In the action in question the
plaintiff was suing in conversion for the value of the ice.   The
court held that any application of the proceeds of the sale to the
payment of the partnership debts was immaterial without a show-
ing that the same was paid with plaintiff's knowledge and approval
as its only proper purpose would be to show ratification, but the
court did hold that any proof of payment of money direct to plain-
tiff was competent as tending to show ratification, and, upon the
question of ratification, the court says: "Fleming's action being en-
tirely beyond the scope of his authority, ratification by the plaintiff
could be accomplished only by his accepting the benefits of it with
full knowledge of all the circumstances."

     In the light of our statutes and the above authorities, we will
refer to the evidence in this case taking, for the purpose of this de-
cision the evidence which respondents claim supports the judgment,
and giving to it its full probative force in favor of such respond-
ents, for the reason that, the verdict being in their favor, such ver-

dict should be sustained if the jury, believing all of the evidence favorable to the respondents, could find facts sufficient to bring the case within the statutes above referred to. The respondents claim that their first conversation was with Mr. Dunn, which conversation was held between Dunn and the plaintiff Griffing, and said evidence relating thereto is as follows: "Mr. Dunn evidently learned of it some way, and came there to Mr. Walsten's shop—Mr. Walsten and I were there, talking together—and wanted me to take what they had left of the harness and saddlery stock. I asked what they had left, and he did not know. At that time the deal was not closed with Mr. Taubman, and I was closing a deal with him, (Taubman). I did not want a little stock like that on hand. I asked him if he wanted to go out of the business. He said they had been trying to get out of the business, and had a few remnants left, and did not think there was $100 worth. Later on, when I and my man had got through invoicing Mr. Taubman's goods, after the invoice and purchase, I went down to Dunn's & Co. to purchase the stock, if they wished to sell it still." Explanatory to the above, will say that it appears that Mr. Walsten had been in the harness business at Bryant, also one Mr. Taubman was in such business, and Mr. Walsten and Mr. Griffing were about to enter into a copartnership, under which partnership arrangement Griffing was to purchase the Taubman stock and combine it with the Walsten stock of goods. It then appears that Griffing went to the place of business of the appellants and asked Van Schoiack if they still wished to sell, and Griffing continues to testify as follows: "We started in to invoice. Mr. Van Schoiack was helping, being the one I was dealing with. We had a little talk until finally Mr. Larson and I had a little talk, and I told Mr. Van Schoiack that I did not care particularly to have the stock. They were nothing but remnants anyway; but I said: 'In order to have you out of the business, I will purchase those goods.' He said, 'We have been trying to get out of the business for a year'; and would not engage in it again at Bryant. He said that. I said: 'Very well, I will take the goods at your invoice price.'" After this the stock was invoiced at appellants' place of business, but there is no evidence to show that either Dunn or Underwood were present.

then or when the above conversation with Van Schoiack was had. There is evidence to show that, after the sale was consummated and a price agreed upon, Dunn again consulted with Griffing as to a slight mistake in the figures. It appears that the goods were inventoried at their list price, and that the amount thereof was slightly under $50. Griffing testifies: "Mr. Dunn came up and said there was a mistake in our footings. I do not remember how much it was, but it was small, and I told him that I did not care particularly about that any. I says I wasn't buying the goods, 'but, to get you out of business,' and settled with them accordingly." It appears that in settlement of this contract for sale of these goods Griffing gave a note to the firm, which was paid several months later. It also appears that the appellant firm did as a matter of fact refrain from engaging in the harness business for the period of some eight months, at the end of which time they purchased a large stock of goods, and continued such business up to the time of this suit.

From the above it will be seen that there is no claim that Underwood took any part whatsoever in the negotiations leading up to and effecting whatever contract was entered into, and there is no direct testimony to show that he authorized either of his partners to enter into any such contract as plaintiffs claim was entered into. To our mind it is doubtful whether or not the jury would have any right to find that Dunn ever agreed that his firm should refrain from engaging in the business; and, in fact, the testimony is very unsatisfactory to show that any distinct understanding was arrived at between Van Schoiack and Griffing. The statute contemplates a contract specifying the time during which, and the territory in which, one will refrain from engaging in the business in question. Giving Van Schoiack's words the strongest interpretation possible in favor of the plaintiffs, it may well be asked how long was the defendant firm to refrain from going into the harness business. But, conceding for the sake of the argument that there was evidence sufficient to justify the jury in finding that Van Schoiack and also Dunn undertook to contract that their firm should not engage in the harness business as long as plaintiffs' firm was engaged therein at Bryant, wherein is there any evidence

that Underwood either knew that there was such an agreement made in connection with the sale of these goods, or wherein was there any evidence showing ratification of the contract by Underwood? It must be borne in mind that the defendants were evidently not actively engaged in the harness business. The evidence clearly shows that they had left but a remnant of a stock. This appears, not only by the statements of the witnesses to that effect, but by the fact that there was only some $50 of goods left. This therefore was not on the part of the defendants the going out of business in which they were actively engaged, but was the sale of a few goods such as would not necessarily excite any inquiry on the part of Underwood as regards any conditions connected with such sale. The defendants claim they sold these goods because they did not have room to carry a stock of harness goods, and that afterwards, when they had more storeroom, they put in a stock. We can see nothing in the mere sale of these goods by any one of the partners which should in any way cause the defendant Underwood to suspect that there had been an agreement not to again enter into this business. There was certainly nothing in the amount of the purchase price which would awaken any suspicion, for the reason that the same as admitted is practically identical with the total appraisal of these goods at their invoice or purchase price. The fact that a note was given which was not paid for several months thereafter in no manner tends to prove a ratification at the time the money for the note was received, because there is nothing to show that at that time Underwood had been advised of what contract his partners had attempted to enter into. Neither is the fact that the defendant firm refrained from re-engaging in this business, when viewed in the light of the other facts shown herein, the slightest evidence that Underwood knew that there had been any contract to refrain from entering into this business again. It must be remembered that in entering into a contract for the sale of the good will of a business, together with a covenant or agreement not to again enter into such business, a partner, as such, has no more or greater authority than would have any clerk or other agent purporting to act for the firm, except in so far as such partner would bind himself as a member of such firm; and, as was

well said in the Montana case above cited: "Ratification * * * could be accomplished only by his accepting the benefits of it with full knowledge of all the circumstances."

For the reasons above given, the judgment of the trial court and the order denying a new trial are reversed.

SMITH and McCOY, JJ., not sitting.